# UNITED STATES DISTRICT COURT
# DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| SIOBHAN MCGEHEE, ) <br> ) <br> Plaintiff, ) <br> ) <br> v. ) <br> ) <br> NANCY A. BERRYHILL, Acting ) <br> Commissioner of Social Security, ) <br> ) <br> Defendant. ) <br> ) | Civil Action No. <br> 18-11389-FDS |

## MEMORANDUM AND ORDER ON PLAINTIFF'S MOTION TO REVERSE AND DEFENDANT'S MOTION TO AFFIRM DECISION OF COMMISSIONER

**SAYLOR, J.**

This is an appeal of a final decision of the Commissioner of the Social Security Administration ("SSA"). On February 7, 2018, the Administrative Law Judge ("ALJ") issued a decision concluding that plaintiff Siobhan McGehee is not disabled. The SSA Appeals Council declined review on May 13, 2018. McGehee then filed an action with this Court.

McGehee seeks reversal of the Commissioner's decision and the Commissioner has moved to affirm. For the reasons stated below, the decision will be affirmed.

## I. Background[1]

Siobhan McGehee is a 36-year-old veteran of the United States Marine Corps. (A.R. 58). She served in the military from 2006 to 2010, including two tours of duty in Afghanistan. (A.R.

---

[1] McGehee's contentions on appeal center on her use of a service dog. Accordingly, the Court has only included facts concerning her background and use of a service dog. Her medical history also includes evidence concerning the following impairments: post-traumatic stress disorder ("PTSD"), generalized anxiety disorder, alcohol use disorder, migraine headaches, carpal tunnel syndrome, bulging discs in her cervical spine, bulimia nervosa, cognitive impairment, traumatic brain injury, and attention impairment. (A.R. 14).

58, 386). While in the military, she was exposed to combat and was the victim of sexual harassment. (A.R. 58, 385). She was the only woman in her unit and began abusing alcohol in order to "keep up with the men." (A.R. 405, 985). She has a history of self-injury and attempted suicide in 2008 while in the Marines. (A.R. 406). She attempted suicide again in 2010 and 2013. (*Id.*).

After her service in the Marine Corps, McGehee worked as a litigation assistant in 2012 and 2013. (A.R. 68). In March 2015, she began working 24 hours per week after attending a vocational skills group and completing a vocational assessment at the REACH program at the Boston Veterans Affairs ("VA") Medical Center. (A.R. 15). In April 2015, she increased her work hours to 32 hours per week, but then decreased them back to 24 hours in May 2015 in order to find an apartment. (*Id.*). Her hours were increased again as of June 2015. (*Id.*).

At some point, McGehee enrolled in college as a full-time student. However, she stopped attending classes in April 2017. (A.R. 62).

At the time of the hearing, McGehee lived alone in an apartment and spent her time watching television, doing puzzles, going on Facebook, and caring for her service dog. (A.R. 60, 66-67). She testified that, at the time of the hearing, her service dog had been with her for six years. (A.R. 65). She testified that her service dog calmed her down when she got anxious and helped her leave the house. (A.R. 73). She testified that she always had her dog with her when she left the house. (*Id.*). On a typical day, she woke up around 10:00 am and took the dog out, fed him, and fed herself. (A.R. 64-65). She would then try to go to the gym or would take long walks with the dog to get out of the house. (A.R. 65). At another point during the hearing, she testified that she normally went to the gym by herself. (A.R. 75). She further testified that she went grocery shopping about once a week and was "[s]ometimes" accompanied by her service

dog. (*Id.*). She reported that she was able to keep up with self-care, but household tasks such as laundry, dishes, and vacuuming were difficult to keep up with at times. (A.R. 66).

Treatment notes reflect that McGehee often, but not always, brought her dog with her to medical appointments. (*See, e.g.* A.R. 404, 451, 467, 494, 519, 581, 645, 650, 789, 835, 848, 860, 866, 871, 1141, 1147, 1161). At times, medical providers referred to her dog as a "service dog" or a "therapy dog." (*See id.*). For example, during an initial evaluation with Rebecca Norris-Bell, Ph.D. at the Boston VA Medical Center in August 2015, Dr. Norris-Bell noted that McGehee "cares for her therapy dog" and that "[h]er dog was present during [the] exam." (A.R. 404). However, at an intake assessment with Heather Nelson, LICSW at the General Mental Health Clinic at the Boston VA in November 2015, Nelson noted that McGehee "spen[t] her days walking her service dog, working out and 'keeping busy with anything,'" but did not indicate that she had brought the service dog to the appointment. (A.R. 844-45).

A March 8, 2017 inpatient note from a detox program reflects McGehee's statement that she "has a service dog who she has left with a friend to care for while she is hospitalized." (A.R. 720). An inpatient note from the following day stated she "was in the process of deciding on CIRCA or a residential program in Palo Alto as she has no one to take care of her dog in MA for that long a period" but "CIRCA ha[d] allowed service dogs to accompany veterans to program before." (A.R. 702). She further noted that she was "concerned about leaving her dog with a friend over the weekend" because she only packed three days' worth of supplies for the dog. (*Id.*).

On June 1, 2017, McGehee began a residential treatment program for substance abuse at the VA Medical Center in Palo Alto, California. (A.R. 1233-34). She reported to a treatment provider there that Boston-area VA programs would not allow her to bring her service dog, so

3

she returned to California for her parents to care for her dog if she was admitted to a residential program. (A.R. 1234). When she went to the Boston VA emergency department requesting alcohol detoxification in December 2017, her provider noted that she had her service dog with her, and that arrangements would need to be made for its care if she was admitted. (A.R. 1154). The dog was described as a "large unleashed Doberman Pinscher." (A.R. 1155). When she again visited the VA emergency department for alcohol detoxification a few days later, she had her dog at her bedside. (A.R. 1147).

McGehee also discussed her dog in her adult function reports. (A.R. 260, 310). In an April 2016 function report, she reported that on a typical day, she woke up and walked her dog, got dressed, went to school for a couple of hours, went to the gym, and then came home and took care of her dog and did homework. (A.R. 260). In another function report, she reported that she has an "emotional support dog" that she takes on walks every day. (A.R. 311).

McGehee also sought VA disability benefits. She was initially awarded a 60% service-connected VA disability rating, with 30% assigned for chronic adjustment disorder and 10% each assigned for limited motion of wrist, degenerative arthritis of the spine, traumatic brain injury, tinnitus, and hiatal hernia. (A.R. 386). As of March 2017, her VA rating was increased to 80%, with 70% assigned for PTSD and 10% each assigned for limited motion of wrist, degenerative arthritis of the spine, tinnitus, hiatal hernia, and migraine headaches. (A.R. 721).

## II.     Procedural History

McGehee filed a claim for disability benefits on December 18, 2015, alleging disability beginning June 15, 2010. (A.R. 85, 232). At some point, she amended her alleged onset date to June 30, 2013. (*See, e.g.* A.R. 15, 21, 87, 99, 236, 243, 278). The SSA denied her application initially on May 24, 2016, and upon reconsideration on July 19, 2016. (A.R. 85-108). On July 26, 2016, she requested a hearing, which was held on January 10, 2018. (A.R. 118-19, 53-84).

4

On February 7, 2018, the ALJ found her to be not disabled. (A.R. 7-45).

McGehee requested a review of the ALJ's decision. (A.R. 51-52). On May 13, 2018, the Appeals Council declined to review the decision and adopted it as the final decision of the Commissioner. (A.R. 1-6). McGehee filed this complaint on December 10, 2018, to review the Commissioner's decision. The Commissioner has moved to affirm the decision.

## III. Analysis

### A. Standard of Review

Under § 205(g) of the Social Security Act, this Court may affirm, modify, or reverse the Commissioner's decision, with or without remanding the case for a rehearing. 42 U.S.C. § 405(g). The ALJ's finding on any fact shall be conclusive if it is supported by "substantial evidence," and must be upheld "if a reasonable mind, reviewing the evidence in the record as a whole, could accept it as adequate to support his conclusion," even if the record could justify a different conclusion. *Rodriguez v. Sec'y of Health & Human Servs.*, 647 F.2d 218, 222 (1st Cir. 1981).

In applying the "substantial evidence" standard, the Court must bear in mind that it is the province of the ALJ, not the courts, to find facts, decide issues of credibility, draw inferences from the record, and resolve conflicts of evidence. *Ortiz v. Sec'y of Health & Human Servs.*, 955 F.2d 765, 769 (1st Cir. 1991). Reversal is warranted only if the ALJ committed a legal or factual error in evaluating the claim, or if the record contains no "evidence rationally adequate . . . to justify the conclusion" of the ALJ. *Roman-Roman v. Comm'r of Soc. Sec.*, 114 F. App'x 410, 411 (1st Cir. 2004); *see also Manso-Pizarro v. Sec'y of Health & Human Servs.*, 76 F.3d 15, 16 (1st Cir. 1996). Therefore, "[j]udicial review of a Social Security claim is limited to determining whether the ALJ used the proper legal standards and found facts based on the proper quantum of evidence." *Ward v. Comm'r of Soc. Sec.*, 211 F.3d 652, 655 (1st Cir. 2000).

## B.    Standard for Entitlement to Disability Benefits

In order to qualify for disability benefits, the claimant must demonstrate that he or she is "disabled" within the meaning of the Social Security Act. The Social Security Act defines a "disability" as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A). The impairment must be severe enough to prevent the claimant from performing not only his or her past work, but also any substantial gainful work existing in the national economy. *See* 42 U.S.C. § 423(d)(2)(A); 20 C.F.R. § 404.1560(c)(1).

An applicant's impairment is evaluated under a five-step analysis set forth in the regulations promulgated under the statute. *See* 20 C.F.R. § 404.1520. The First Circuit has described the analytical sequence as follows:

> First, is the claimant currently employed? If he is, the claimant is automatically considered not disabled.
>
> Second, does the claimant have a severe impairment . . . mean[ing] an impairment 'which significantly limits his or her physical or mental capacity to perform basic work-related functions[?]' If the claimant does not have an impairment of at least this degree of severity, he is automatically considered not disabled.
>
> Third, does the claimant have an impairment equivalent to a specific list of impairments contained in . . . Appendix 1 [of the Social Security regulations]? If the claimant has an impairment of so serious a degree of severity, the claimant is automatically found disabled. . . . If, however, his ability to perform basic work-related functions is impaired significantly (test 2) but there is no 'Appendix 1' impairment (test 3), the [ALJ] goes on to ask the fourth question:
>
> Fourth, does the claimant's impairment prevent him from performing work of the sort he has done in the past? If not, he is not disabled. If so, the agency asks the fifth question.
>
> Fifth, does the claimant's impairment prevent him from performing other work of the sort found in the economy? If so, he is disabled; if not, he is not disabled.

*Goodermote v. Sec'y of Health & Human Servs.*, 690 F.2d 5, 6-7 (1st Cir. 1982).

The burden of proof is on the applicant as to the first four inquiries. *See* 42 U.S.C. § 423(d)(5)(A) ("An individual shall not be considered to be under a disability unless he furnishes such medical and other evidence of the existence thereof as the [ALJ] may require."). If the applicant has met his or her burden as to the first four inquiries, then the burden shifts to the Commissioner to present "evidence of specific jobs in the national economy that the applicant can still perform." *Freeman v. Barnhart*, 274 F.3d 606, 608 (1st Cir. 2001). In determining whether the applicant is capable of performing other work in the economy, the ALJ must assess the applicant's residual functional capacity ("RFC") in combination with vocational factors, including the applicant's age, education, and work experience. 20 C.F.R. § 404.1560(c).

### C.     The ALJ's Findings

In evaluating the evidence, the ALJ conducted the five-part analysis called for by Social Security Act regulations.

At step one, the ALJ found that McGehee had not engaged in substantial gainful activity during the period since her alleged onset date of June 30, 2013. (A.R. 13).

At step two, the ALJ found that McGehee had the following severe impairments: PTSD, generalized anxiety disorder, alcohol use disorder, and migraine headaches. (*Id.*). She found that there was no evidence in the record that McGehee's carpal tunnel syndrome and bulging discs in her cervical spine were medically determinable impairments. (*Id.*). She found that McGehee's history of bulimia nervosa was non-severe. (*Id.*). In addition, she found that McGehee had no cognitive impairment and no medically determinable traumatic brain injury or attentional impairment. (A.R. 14).

At step three, the ALJ found that McGehee did not have an impairment or combination of impairments that met or medically equaled the severity of an impairment listed in 20 C.F.R. Pt.

7

404, Subpt. P, App. 1. (*Id.*). The ALJ evaluated her impairments under listings 11.00 (neurological disorders) and 12.00 (mental disorders) and concluded that the evidence did not support a finding that met the severity listed in 20 C.F.R. Pt. 404, Subpt. P, App. 1. (*Id.*). As to the migraine headaches, the ALJ found that the record did not contain the objective signs, symptoms, or findings, or the degree of functional restriction necessary for McGehee's physical impairments to meet or equal in severity any listed impairment. (*Id.*). As to the mental impairments, the ALJ found that she had moderate limitations in all four "paragraph B" criteria (B1: understand, remember, or apply information; B2: interact with others; B3: concentrate, persist, or maintain pace; B4: adapt or manage oneself). (A.R. 15-16, 19-20). She found that McGehee's alcohol use affected her concentration, persistence, and pace, as well as her ability to adapt and manage herself. (A.R. 19-20). However, she also found that even with alcohol use, McGehee was able to initiate and complete tasks necessary to care for herself and her service dog, makes plans to travel to and from California, and make and attend medical appointments. (*Id.*). For example, she found that McGehee was able to move from California to Massachusetts with only her service dog, obtain housing, complete at least one semester of college, and appear well groomed at most visits to the VA. (A.R. 20). She found that McGehee was able to adapt to minor changes in work demands. (*Id.*). Because McGehee's mental impairments did not cause at least two "marked" limitations or one "extreme" limitation, the "paragraph B" criteria were not satisfied. (*Id.*). The ALJ further found that the mental impairments do not satisfy the "paragraph C" criteria because the record did not show that her capacity to adapt to changes or demands is minimal. (*Id.*)

At step four, the ALJ found that McGehee was unable to perform any past relevant work. (A.R. 39). McGehee's past employment as a litigation assistant was semi-skilled, but her RFC

limits her to simple, routine instructions. (*Id.*).

At step five, the ALJ found that McGehee had the RFC to perform a full range of work at all exertional levels with the following non-exertional limitations: she is able to understand, remember, and carry out simple and routine instructions for two-hour intervals over the course of an eight-hour workday and forty-hour workweek. (A.R. 20). She can tolerate occasional interactions with supervisors, coworkers, and the general public, and can adapt to minor changes in the work setting. (*Id.*).

In considering McGehee's symptoms, the ALJ followed a two-step process. (A.R. 21). In step one, she found that McGehee's medical impairments could reasonably be expected to cause the alleged symptoms. (A.R. 34).

In step two, she evaluated the intensity, persistence, and limiting effects of McGehee's symptoms to determine the extent to which they limit her functional limitations. (A.R. 21). She noted that the record contained several inconsistencies concerning McGehee's use of her service dog, head injuries, sexual trauma, difficulty sleeping, PTSD, alcohol use, anxiety, and panic attacks. (A.R. 35-37). At one point, McGehee testified that she always has her service dog with her when she leaves the house; however, she also testified that she goes to the gym alone and only sometimes takes her dog grocery shopping with her. (A.R. 36). The ALJ found that McGehee's psychological symptoms can negatively affect her functioning at times, particularly when she is using alcohol. (A.R. 38). However, the ALJ found that even with alcohol use, McGehee was able to initiate, remember, and complete the tasks necessary to care for herself and her service dog; make plans to travel to and from California; and make and attend medical appointments. (*Id.*).

After giving great weight to the opinions of Dr. Aryeh Shestopal and Dr. Judith Kellmer,

9

the state agency psychological consultants, the ALJ found that McGehee could carry out simple and routine tasks and is able to adapt to minor changes in work demands. (*Id.*). However, she also found that her anxiety, PTSD, and migraine headaches limit her ability to understand and remember detailed instructions. (*Id.*). She further found that her receipt of multiple courses of Botox supports the severity of her migraine headaches, despite the state medical consultant's finding that her headaches were non-severe. (*Id.*). The ALJ therefore considered McGehee's migraine headaches when assessing her RFC. (*Id.*).

The ALJ concluded that considering McGehee's age, education, work experience, and RFC, there were a significant number of jobs in the national economy that she could perform. (A.R. 39). She relied on the testimony of the vocational expert ("VE") that someone with McGehee's same characteristics could work in representative occupations such as commercial cleaner, hospital cleaner/laundry aide, and merchandise maker. (A.R. 40). The ALJ determined that she was capable of making a successful adjustment to these occupations. (A.R. 41).

In summary, the ALJ found that McGehee did not suffer from a disability between the alleged onset date of June 30, 2013 and December 31, 2017, under § 1614(a)(3)(A) of the Social Security Act. (*Id.*).

### D. McGehee's Objections

McGehee contends that the ALJ erred by not evaluating her use of a service dog in the RFC assessment and whether the service dog constitutes a workplace accommodation. She further contends that the ALJ should have assessed whether she could perform the suggested jobs in step five with a service dog.

There does not appear to be any First Circuit or District of Massachusetts authority that provides a standard for determining when a service dog must be included in the RFC assessment for disability benefits. However, other courts have found that the use of a service dog must be

medically necessary to be considered in an RFC assessment. *See Santos v. Colvin*, 2013 WL 5176846, at *2, *6 (W.D. Wash. Sept. 12, 2013) (finding that ALJ erred by not considering the vocational impact of plaintiff's use of a service dog when there was "at least some evidence in the record that plaintiff's use of a service dog [was] medically necessary"); *Payano v. Colvin*, 2017 WL 4778593, at *4 (D. Nev. Oct. 23, 2017) (finding ALJ's failure to include use of service dog in hypothetical posed to VE harmless where evidence did not support assessment that dog was "necessary for Plaintiff to work").

A claimant's use of a service dog must be considered by the ALJ when there is evidence of a prescription from a medical provider for the dog. *See Rentfro v. Colvin*, 2015 WL 12868081, at *13 (C.D. Ill. Oct. 21, 2015) (finding ALJ's failure to adequately address evidence of plaintiff's prescription from doctor for service dog was material). Absent a prescription, courts are split on whether a letter recommending a service dog from a medical source is sufficient to show that the dog is medically necessary. *Compare Payano*, 2017 WL 4778593, at *4 (finding letter from psychiatrist recommending service dog alone does not support an assessment that dog is necessary for plaintiff to work), *with Santos*, 2013 WL 5176846, at *5 (remanding where doctor provided letter indicating that plaintiff required a service dog). The court in *Santos* suggested that a letter from a medical source may be superfluous when the record establishes that plaintiff's service dog "has been of significant benefit to him in terms of his mental health symptoms." 2013 WL 5176846, at *5 (finding the record contained evidence that service dog had greatly reduced plaintiff's panic attacks and agoraphobia).

Here, there is conflicting evidence in the record as to whether McGehee's service dog was medically necessary. On the one hand, McGehee testified that "her service dog calms her down and helps her leave the house." (A.R. 33, 73). She further testified that "[s]he always has

11

her dog with her when she leaves the house." (A.R. 34, 73). On the other hand, there is no evidence in the record that she had a prescription for the dog, or even a letter from a medical source recommending a dog. There is also no evidence that her service dog has been certified, and no medical evidence that it has contributed significantly to improving her mental-health symptoms. The ALJ noted that it was not clear whether McGehee took her dog to class or whether her dog was allowed in the passenger cabin during her flights to and from California. (A.R. 36). The record therefore shows that while she was often accompanied by her service dog when she left her home, there were at least some activities that she conducted alone. (*Id.*). The ALJ noted the inconsistencies regarding her use of her service dog in the record and declined to include her use of the dog in the RFC assessment. (A.R. 20, 36).

On balance, although the ALJ's treatment of McGehee's service dog was not exhaustive, her failure to address this issue in the RFC assessment was not material because McGehee failed to provide sufficient evidence that her dog was medically necessary. Considering the conflicting evidence in the record, the ALJ could have reasonably concluded that McGehee's use of a service dog was not medically necessary. The lack of a prescription or letter recommending a service dog further supports the ALJ's decision to not include the dog in her RFC assessment.

Accordingly, the ALJ did not commit reversible error by failing to include the use of a service dog in McGehee's RFC assessment. It is therefore not necessary to reach the issue of whether the ALJ should have assessed whether she could perform the suggested jobs in step five with a service dog.

## IV. Conclusion

For the foregoing reasons, the motion of defendant to affirm the decision of the Commissioner is GRANTED.

**So Ordered.**

                                                                /s/ F. Dennis Saylor
                                                               F. Dennis Saylor IV
Dated: July 2, 2019                                United States District Judge